

**ORDERED in the Southern District of Florida on May 23, 2014.**

**Robert A. Mark, Judge**
**United States Bankruptcy Court**

_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| In re | ) CASE NO. 92-30190-BKC-RAM and |
| | ) CASE NO. 92-30191-BKC-RAM |
| SOLITRON DEVICES, INC., and | ) (Jointly Administered) |
| SOLITRON MICROWAVE, INC., | ) |
| | ) CHAPTER 11 |
| Debtors. | ) |

**ORDER REOPENING CASE AND GRANTING IN PART AND**
**DENYING IN PART DEBTOR'S MOTION TO ENFORCE CONFIRMATION ORDER**

The Debtors' chapter 11 plan in these jointly administered cases was confirmed more than twenty (20) years ago in August 1993. The Court now reopens these cases to consider the Reorganized Debtor's Motion to Enforce this Court's Order Confirming Plan (the "Motion to Enforce") [DE #906].

**Introduction**

Prior to the filing of the bankruptcy cases, Solitron Devices Inc. ("Solitron"), may have contributed to the contamination of a landfill in Clarkstown, New York. Years later, in 2002, the New York State Department of Environmental Conservation (the "State" or "NYSDEC") sent notices of potential liability to several companies, including Solitron. These companies that the State believed contributed to the contamination are often referred to as Potential Responsible Parties ("PRPs").

A group of the PRPs settled with the State and in August 2013, these PRPs sued Solitron for contribution. The Debtors now move to reopen this bankruptcy case to stop this litigation. The Court agrees with the Debtors' arguments on the key legal issues. The State had a claim, in these bankruptcy cases and received adequate notice of its obligation to assert that claim. The State did not file a proof of claim, and therefore, any liability Solitron may have had for contributing to the contamination of the landfill has been discharged. Moreover, because the PRPs can only pursue a contribution claim if Solitron has common liability to the State, the PRPs' claim against Solitron fails.

**Undisputed Facts: Before Bankruptcy**

1.  At all relevant times Solitron was in the business of designing, developing, manufacturing and marketing parts and devices for the military and aerospace markets.

2.  From 1961 to 1987 Solitron operated a manufacturing facility in Tappan, New York.  The Tappan facility is located within 5 miles of the Clarkstown landfill [DE #906-9, p. 59].

3.  On November 8, 1979 the NYSDEC sent a letter to the Clarkstown landfill informing them that Solitron had been cited on October 30, 1979 for delivering a "dumpster with refuse" from its Tappan facility to the Clarkstown landfill on October 27, 1979 (the "Citation Letter") [DE #906-1].

4.  On June 30, 1989, the Clarkstown landfill was listed in the New York State Registry of Inactive Hazardous Waste Disposal Sites.

5.  On August 7, 1989, the NYSDEC and the town of Clarkstown entered into a consent order obligating Clarkstown to clean up the Clarkstown landfill and entitling it to state assistance to accomplish the cleanup [DE #906-2]. The consent order required Clarkstown to assist the NYSDEC in identifying all parties responsible for the contamination. There is no evidence in the record that Clarkstown identified Solitron as a PRP prior to confirmation of the Debtors' Plan in August 1993.

6. On October 17, 1989, the NYSDEC and Clarkstown entered into a state assistance contract which provided that the NYSDEC would reimburse Clarkstown for 75% of the costs it would incur in the cleanup of the Clarkstown landfill [DE #906-3].

7. A remedial investigation began "during the Summer and Fall of 1990." NYSDEC Record of Decision [DE #915-1].

8. On December 31, 1990, the Clarkstown landfill was closed. It is therefore undisputed that any conduct by Solitron that contributed to the contamination occurred prior to the filing of these bankruptcy cases. Moreover, it is undisputed that prior to Solitron's bankruptcy, the State knew that the Clarkstown landfill had to be cleaned up and knew that Solitron had been cited in 1979 for attempting to dump potentially hazardous material at the site.

**Undisputed Facts: The Chapter 11 Cases**

9. On January 24, 1992, the Debtors filed for chapter 11 relief and the cases were jointly administered.

10. On October 27, 1992, the Debtors filed an Application for Order Establishing Supplemental Bar Date and Approving Form and Procedure of Notice (the "Application") [DE #323 and DE #906-4]. The Application asked the Court to establish notice procedures to supplemental creditors and to set a deadline for those creditors to file claims. The supplemental creditors were

4

primarily individuals and entities whose claims, if any, arose out of any environmental contamination allegedly caused by the Debtors. The notice sent out to creditors (the "Notice") [DE #906-4 pp. 7-11] specifically identified the Debtors' facilities, including the Tappan New York facility located near the Clarkstown landfill. The Notice stated in relevant part:

> PLEASE TAKE FURTHER NOTICE THAT acts or omissions of the Debtors that occurred prior to the date of filing for relief under the Bankruptcy Code, including any environmental contamination and any injury caused as a result thereof, may give rise to a claim against the Debtors notwithstanding the fact that such claims (or the injuries on which they are based) may be contingent or may not have occurred, matured or become fixed or liquidated prior to such date...
>
> …
>
> PLEASE TAKE FURTHER NOTICE THAT this notice is being [mailed to you/published] because of potential liability arising from any release of or contamination by hazardous or toxic substances or arising from the use, handling, storage or disposal of such substances:
> (A) Whether for claims including but not limited to, personal injury, property damage, clean-up costs, response costs, fines or penalties or for contribution or indemnification….

11. On October 29, 1992, the Court granted the Application, approved the form of the Notice, and established November 24, 1992 as the deadline for supplemental creditors to

5

file proofs of claim. The Debtors mailed the Notice to the NYSDEC and the NYSDEC did not file proofs of claim.[1]

12. On August 19, 1993, this Court entered the Order Confirming the Debtors' Fourth Amended Plan of Reorganization (the "Confirmation Order") [DE #707]. The Confirmation Order contains an injunction preventing discharged claim holders from proceeding against the reorganized Debtors. The case was closed on July 12, 1996.

**Undisputed Facts: After Bankruptcy**

13. The NYSDEC completed its Final Remedial Investigation Report for the Clarkstown landfill in April 1995 and issued a Report of Decision on November 28, 1995. According to the Report of Decision, the Remedial Investigation took place "during the Summer and Fall of 1990 with additional work between the Summer of 1991 to Fall of 1993." [DE #915-1 p.6]. Therefore, even though the Report of Decision was not issued until 1995, the Report establishes that the investigation began long before Solitron confirmed its Plan.

14. In 2002, the NYSDEC sent various notices of potential liability to PRPs regarding the contamination of the Clarkstown landfill. Solitron was one of these PRPs [DE #915-2].

---

[1] The Debtors' noticing agent mailed the notice to NYSDEC at three separate addresses [DE #917-5, pp. 7, 12].

15. In 2002, various PRPs formed the Clarkstown Landfill Joint Defense Group (the "JDG") to facilitate their defense of the NYSDEC claims.

16. In March 2011, the State of New York and the NYSDEC filed suit in the United States District Court for the Southern District of New York against the town of Clarkstown and the JDG members (Civil No. 11-CV-0293(KMK/LMS), the "District Court Case").

17. In 2011, a Consent Decree was entered in the District Court Case between the NYSDEC, the JDG, and the town of Clarkstown which settled all claims against the JDG defendants for $4,000,000, an amount later reduced to $3,750,000 [DE #915-3].

18. In August 2013, the JDG filed its Third-Party Complaint in the District Court Case against Solitron and other PRPs who did not participate in the settlement. The Third-Party Complaint seeks contribution under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA")(the "Contribution Lawsuit") [DE #906-9].

19. The Third-Party Complaint alleges that "Solitron operated a facility within five miles of the [Clarkstown landfill]," and alleges that on or about October 27, 1979, "Miele Sanitation transported at least eleven 55-gallon drums of oily substances from Solitron to the [Clarkstown landfill]." [¶¶

7

382-83 of the Third-Party Complaint, DE #906-9, p. 59]. This 1979 incident is the same incident referred to in the Citation Letter sent by the NYSDEC to the Clarkstown landfill described earlier in paragraph 3.

20. On January 24, 2014, Solitron filed the Reorganized Debtor's Emergency Motion to Reopen Chapter 11 Case (the "Motion to Reopen") [DE #905] and filed the Motion to Enforce. On January 30, 2014, the Court entered a briefing schedule setting the Motion to Enforce for hearing and setting deadlines for a response and a reply [DE #907]. The briefing deadlines were subsequently amended by agreement and the hearing on the Motion to Enforce was ultimately set for April 22, 2014 [DE #910 and 919]. The JDG filed its Response to the Motion to Enforce on February 28, 2014, [DE #915] and a Supplemental Response on March 14, 2014 [DE #916]. The Debtors filed their Reply in support of the Motion to Enforce on March 14, 2014 [DE #917]. The hearing on the Motion to Enforce proceeded as scheduled on April 22, 2014.

**Summary of the Arguments**

The Debtors seek to enjoin the JDG from pursuing the Contribution Lawsuit against Solitron. The Debtors argue that the Confirmation Order discharged the NYSDEC's Clarkstown landfill claim against the Debtors. Since Solitron has no

8

liability to the NYSDEC and because common liability is a requirement for CERCLA contribution claims between PRPs, the Debtors argue that the JDG has no legal basis to pursue a contribution claim.

In response the JDG argues that the NYSDEC did not have a prepetition claim because the NYSDEC was unaware of Solitron's potential pollution of the Clarkstown landfill or the existence of any CERCLA claims against Solitron until 1995 at the earliest, long after the Court entered the Confirmation Order. The JDG also argues that even if the NYSDEC's claim was discharged, the JDG's claims were not, and therefore, the JDG can still pursue its Contribution Lawsuit against Solitron.

**The NYSDEC had a Prepetition Claim that was Discharged**

The Court must first determine whether the NYDEC had a pre-petition claim against the Debtors. The Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecure...." 11 U.S.C §101(5). In interpreting the legislative intent of section 101(5), the Eleventh Circuit reads the definition broadly to include "all legal obligations of the debtor, no matter how remote or contingent...." *Epstein v. Official Comm. of Unsecured Creditors*

9

of the Estate of Piper Aircraft Corp. (In re Piper Aircraft, Corp.),* 58 F.3d 1573, 1576 (11th Cir. 1995)("*Piper*"). A creditor need not have a cause of action that can be pursued under non-bankruptcy law to hold a claim under the Bankruptcy Code. *In re Nat'l Gypsum Co.*, 139 B.R. 397 (N.D. Tex. 1992)("*Gypsum*").

Several courts have considered whether contingent environmental claims for future cleanup costs are claims in bankruptcy cases. An often cited decision is *In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991)("*Chateaugay*"). The debtor in *Chateaugay* provided notice to the EPA in all 50 states and the District of Columbia about the existence of contingent environmental claims. The EPA in turn filed claims of $32 million, representing the EPA's prepetition response costs under CERCLA at 14 sites in which the Debtor was known to be a PRP. The EPA, prior to confirmation of a chapter 11 plan of reorganization, determined that the 14 sites for which it sought a recovery was a non-exhaustive list of potential sites that the debtor polluted. *Chateaugay*, 944 F.2d at 997-1001.

The EPA's decision not to file contingent claims on potential sites triggered the need to determine whether these potential future cleanup costs on other sites were bankruptcy claims. The debtor informed the EPA that in its plan it sought to discharge all claims held by the EPA for prepetition conduct, whether the EPA knew about the existence of those claims or not.

10

*Id*. The EPA then filed an adversary proceeding asking the court not to discharge post-confirmation response costs because those post-confirmation response expenses were not "claims" within the meaning of the Bankruptcy Code. *Id*. In holding that all response expenses incurred post-petition from prepetition conduct could be discharged, the Second Circuit reasoned that "[t]he relationship between environmental regulating agencies and those subject to regulation provides sufficient 'contemplation' of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of 'claims.'" *Id*. at 1005.

Other courts which have addressed similar environmental issues in bankruptcy focus on *Chateaugay's* use of the word "fairly" and find that for environmental agencies to hold dischargeable claims, the agencies need to be capable of fairly contemplating their unmatured contingent claims at the time of the bankruptcy. Like *Chateaugay*, the *Gypsum* case involved EPA claims for known polluted sites and unknown polluted sites. The *Gypsum* court concluded that:

> The only meaningful distinction that can be made regarding CERCLA claims in bankruptcy is one that distinguishes between costs associated with pre-petition conduct resulting in a release or threat of release that could have been "fairly" contemplated by the parties; and those that could not have been "fairly" contemplated by the parties.

11

139 B.R. at 407-08. The *Gypsum* court held that the EPA could have fairly contemplated claims for unknown sites. The court considered the following factors in making its determination: "knowledge by the parties of a site in which a PRP may be liable, NPL listing ["National Priorities List"], notification by EPA of PRP liability, commencement of investigation and cleanup activities, and incurrence of response costs." *Id*.

Although the *Gypsum* court included the incurrence of response costs as a factor, incurring costs prior to the bankruptcy is not a condition for finding that a claim exists. *See In re Chicago, Milwaukee, St. P. & Pac. R.R.*, 974 F.2d 775, 785 (7th Cir. 1992). As mentioned earlier, under the broad definition of a claim in the Bankruptcy Code, a creditor may have a bankruptcy claim even if events have not yet occurred which would support a cause of action under non-bankruptcy law. This meant that although the EPA's claim was not ripe for adjudication under CERCLA, it was still a claim under the Bankruptcy Code because the actions of the debtor giving rise to the liability occurred prepetition. *Gypsum*, 139 B.R. at 405.

The Ninth Circuit discussed both *Gypsum* and *Chateaugay* in *In re Jensen*, 995 F.2d 925 (9th Cir. 1993)("*Jensen*"). The *Jensen* court concluded that the California Regional Water Quality Control Board (the "California Water Board") and the California

Department of Health Services (the "California DHS," and together with the "California Water Board," the "California State Parties") had claims for potential environmental pollution caused by the lumberyard debtor and the debtor's principals.

In *Jensen*, prior to the bankruptcy filing, a California Water Board inspector visited the debtor's lumberyard and sent a letter to the debtor and its principals informing them of pollution caused by the lumberyard. 995 F.2d at 926-27. The debtor and the debtor's principals both subsequently filed for bankruptcy and both obtained a discharge. *Id*. The California State Parties, after unsuccessfully trying to persuade the polluters to clean up the site, spent over $900,000 in cleanup costs post-discharge. *Id*. The California State Parties then moved to collect from the debtor's principals. In response, the debtor's principals moved to reopen their individual case to add the California State Parties as creditors and sought an order that the environmental cleanup claim had been discharged. *Id*.

The *Jensen* court adopted the "fair contemplation" test discussed in *Gypsum* and imputed knowledge of the pollution from the California Water Board inspector to the California DHS. The Court ultimately ruled that, under the facts of the case, "the state had sufficient knowledge of the Jensens' potential liability to give rise to a contingent claim for cleanup costs before the Jensens filed their personal bankruptcy petition on

13

February 13, 1984. The claim filed by California DHS against the Jensens therefore was discharged in the Jensens' bankruptcy." *Id*. at 931.

One decision cited and relied upon by the JDG, *Sylvester Bros. Dev. Co. v. Burlington N.R.R.,* 133 B.R. 648 (D. Minn. 1991)("*Sylvester*"), takes a much narrower view of when environmental claims arise in bankruptcy. In *Sylvester*, the Minnesota Pollution Control Agency (the "MPCA") entered into a reimbursement agreement with a landfill site. 133 B.R. at 650. The landfill in turn sued various PRPs for recovery under CERCLA, including Pako Corporation, a debtor that had received a discharge prior to the PRP contribution suit. *Id*. The *Sylvester* court found that the MPCA did not hold a claim that was discharged. *Id*. at 653.

This Court finds *Sylvester* to be an outlier case and rejects its holding and reasoning. The *Sylvester* court's conclusion that the MPCA did not have sufficient knowledge and notice to hold a claim is surprising under the facts presented. The MPCA had knowledge of the bankruptcy, the MPCA knew of Pako's involvement in the pollution of a different site and was listed as a creditor on that other site, the site in question had been placed on a CERCLA national priorities list, and the MPCA had already investigated the site and identified Pako as a PRP prior to confirmation.

In holding that the environmental claims had not been discharged, the *Sylvester* court stated that the "problems posed for CERCLA enforcement by dismissing the debtor outweigh the debtor's hope for discharge." *Sylvester,* 133 B.R. at 654. This policy statement is at odds with the strong bankruptcy policy of bringing all potential claims into the case and discharging as many debts as possible.

The Eleventh Circuit has not specifically addressed the issue of when environmental cleanup costs become a claim in bankruptcy but in *Piper* the Eleventh Circuit discussed *Chateaugay* in the products liability context. *Piper* held that a products liability claim arises in bankruptcy when "(i) events occurring before confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor's product; and (ii) the basis for liability is the debtor's prepetition conduct in designing, manufacturing and selling the allegedly defective or dangerous product."

Under the *Piper* test, the NYSDEC had a claim. The polluting conduct, if any, occurred prepetition, and the NYSDEC had an identifiable prepetition relationship with Solitron. Prior to the bankruptcy, the NYSDEC had identified the Clarkstown landfill as a polluted site, closed the site, knew that Solitron had been cited for improper dumping at the landfill, knew that Solitron had a facility 5 miles from the landfill, and was put

15

on specific notice that Solitron was seeking to include any potential environmental claims in its bankruptcy case.

The facts in this case also meet the criteria for finding that the NYSDEC held a claim under all of the environmental cases discussed in this opinion with the exception of *Sylvester*. Like in *Jensen*, the NYSDEC specifically knew of Solitron's pollution of the Clarkstown landfill as evidenced by the Citation Letter. Counsel for the JDG argued at the April 22nd hearing that the Citation Letter was sent in 1979, many years before any of the relevant events in this case, and that it is therefore not sufficient notice to the NYSDEC. The Court disagrees. Notice that something happened does not become stale or irrelevant just because years have passed or the entity receiving notice simply forgets about it.

The broad definition of "claim" under the Bankruptcy Code furthers the policy of allowing debtors to deal with as many liabilities as possible arising from their prepetition activities, including ferreting out all potential environmental claims. *See Jensen*, 995 F.2d at 928. Environmental agencies may have to undertake due diligence much earlier than in the normal course of cleaning up contaminated sites and pursuing PRPs to present their contingent claims in bankruptcy cases. The NYSDEC had that due diligence obligation in this case when the Debtors specifically gave them notice that its activities close to a

16

known designated site may have caused contamination. If the NYSDEC had reviewed its records, it would have discovered the Citation Letter that conclusively linked Solitron to the Clarkstown landfill.

In sum, the NYSDEC had notice of the bankruptcy, knowledge that the Clarkstown landfill would require cleanup, and knowledge of Solitron's relationship to the site. The Notice sent out by the Debtors to the NYSDEC specifically identified Solitron's Tappan facility as a possible source of an environmental claim and put the NYSDEC on sufficient notice to file a claim. Under the definition of a claim in section 101(5) of the Bankruptcy Code and applicable case law interpreting that definition in the context of environmental claims, the NYSDEC held a prepetition claim against Solitron for potential cleanup costs at the Clarkstown landfill site and that claim was discharged when Solitron confirmed its Plan.

### The JDG's Claims and the Contribution Lawsuit

The JDG argues that even if the NYSDEC's claims were discharged, the JDG claims were not discharged because, among other things, the JDG did not exist until 2002. The Court agrees with the JDG on this point. There was no prepetition relationship between Solitron and any JDG members, nor is there

any evidence in the record that JDG members knew about any claims against Solitron prior to 2002.

The JDG then argues that because its claims were not discharged it can proceed against Solitron in the Contribution Lawsuit. On this point, the Court disagrees. The JDG sued Solitron under Section 113(f)(1) of CERCLA. Section 113(f)(1) allows PRPs that are sued under section 107(a) of CERCLA to seek contribution from other PRPs. The Supreme Court, in *United States v. Atlantic Research Corp.*, 551 U.S. 128, 138-139 (2007), held that "113(f)(1) permits suit before or after the establishment of common liability. In either case, a PRP's right to contribution under §113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties."

Because the NYSDEC held a prepetition claim that was discharged, Solitron and the JDG do not have common liability to the NYSDEC in regards to the Clarkstown landfill. Without common liability, the JDG has no basis to pursue a CERCLA contribution claim agaisnt Solitron.

### Appropriate Relief

Even though the Court agrees with Solitron's position on the two legal issues presented by the Motion to Enforce, the Court lacks jurisdiction to enjoin the JDG from pursuing the

18

Contribution Lawsuit. Because the JDG did not have a claim that was discharged, the JDG did not violate the Confirmation Order in pursuing the Contribution Lawsuit. The Court addressed whether the JDG had a legal basis to pursue a CERCLA contribution claim after determining that the NYSDEC's claim was discharged because the parties briefed and argued the issue. Nevertheless, it is up to the District Court in the Contribution Lawsuit to dismiss the claim against Solitron if the JDG chooses to proceed. Finally, because the JDG did not violate the Confirmation Order, the Debtor's request for fees and costs is also denied. Therefore it is-

**ORDERED** as follows:

1.   The Motion to Reopen is granted.

2.   The Motion to Enforce is granted in part to the extent that the Court concludes that the NYSDEC's claim against Solitron was discharged and concludes that the JDG has no legal basis to pursue a CERCLA contribution claim against Solitron.

3.   The Motion to Enforce is denied to the extent the Debtors seek to enjoin the JDG from pursuing the Contribution Lawsuit and denied to the extent the Debtors seek fees and costs.

4.   Upon finality of this Order, the case shall be re-closed.

###

COPIES TO:

Andrew V. Layden, Esq.
BakerHostetler LLP.
200 S Orange Ave.
SunTrust Center, Suite 2300
Orlando, FL 32801-3432

Gary D. Justis, Esq.
THE JUSTIS LAW FIRM, LLC
5251 w. 116TH Place
Suite 200
Leawood, KS  66211

**(Attorney Layden is directed to serve a copy of this Order on all other interested parties and file a Certificate of Service)**